## Braverman v. Edgmont B. & L. Assn.

*Guy G. deFuria*, for plaintiff.

*Archie Levy*, for defendant.

FRONEFIELD, P. J., February 8, 1938.—This was a bill in equity filed by plaintiffs to determine when their stock in the defendant association should have matured. Plaintiffs alleged that it should have matured in March 1934, while defendant alleged that it did not mature until April 1936. The answer is dependent upon whether the reserves set up by defendant were excessive or illegal.

The evidence of defendant, which was uncontradicted, establishes the method used in arriving at the amount of the reserves and we have found as a fact that they were not excessive. The question remains as to whether or not they were legally set up.

Section 620 of the Building and Loan Code of May 5, 1933, P. L. 457, provides:

"Every association shall set aside each year not less than five per centum and not more than fifteen per centum of its net profits for such year, unless the department in writing approves the setting aside of a lesser or a greater amount, as a reserve for contingent losses, until the total amount of such reserve shall equal at least five per centum and not more than ten per centum of the assets of such association, unless the department in writing approves the creation of a total reserve of a lesser or a greater amount. The department may at any time require any association to set aside such additional amount as the department shall deem necessary to safeguard the interests of the shareholders of such association. Such reserve for contingent losses may be loaned or invested in the same manner as is authorized by this act in the case of other funds of the association.

"If, due to a reduction of the assets of an association or due to any other cause whatsoever, the reserve for contingent losses shall exceed ten per centum of the assets of the association, or, if the department has authorized or directed the creation of a reserve for contingent losses in excess of such ten per centum and such reserve exceeds such amount authorized or directed by the department, the amount above such ten per centum or such other amount as has been authorized or directed by the department shall be transferred, at the next regular meeting of the board of directors, to the general profit account of the association."

Plaintiffs contend that the reserves set up by defendant were more than were permitted by this section of the

code and that the balance should have been returned to the profit account. This would be true if we considered all the reserves set up by defendant as "reserves for contingent losses." The evidence shows that, for the year ending October 1933, defendant set up $20,506.59 as a contingent reserve and, in addition thereto, $35,187.73 as a special reserve. In 1934, the contingent reserve remained the same but $44,887.73 was set up as a special reserve. In 1935, the two reserves were lumped at $75,-023.33, and in 1936, they were reduced to $57,725.92. In each instance, the figure used for the special reserve was obtained by taking each property, which defendant owned or on which it held a mortgage, and calculating what value would be necessary for the association to collect the full amount invested therein and deducting from that value the then market value as determined by the board of directors from an appraisal of that particular property. The net figures for each of these properties were added together and the total set up as the special reserve.

While there have been no cases in Pennsylvania construing the meaning of "reserve for contingent losses" either under the Building and Loan Code, supra, or under prior acts which permitted such a reserve, we are of the opinion that these acts contemplated losses of an unexpected nature which could not be anticipated and specially provided for, such as an explosion not covered by insurance, destroying a building owned by or mortgaged to the association, or a loss due to a defect in title, etc. We feel that it was not intended to provide for a situation where there has been a general decline in the real estate market to the point where the board of directors can see that certain properties in which they have invested the stockholders' funds are no longer ample security for the investment. These losses had actually occurred before the special reserve was set up. Such a situation actually represents a depreciation of the assets of the association, and it might have been better bookkeeping to have reduced

the asset side of the report by listing the mortgages and real estate at their present worth, rather than to have carried them at their face value and to have increased the liability side of the report by the addition of the special reserve. However, the same result is obtained.

To follow the contention of plaintiffs would be to compel the association to base its profits on false assets and to this we cannot agree.

Plaintiffs further contend that, even if the association had the legal right to set up the special reserve, it did not do so until after their shares had matured and that it was then too late to affect their rights. The fallacy in this argument is the assumption that the shares had matured. Plaintiffs relied entirely on the printed report of the association for October 1933, which purported to show that, at that time, the shares in the twenty-first series were worth $195.12 each, together with payments for five additional months. However, the evidence clearly shows that the printed report was in error in that the assets were appraised at more than their actual worth. Certainly, since all stockholders in a building and loan association are partners, one partner cannot take advantage of such a mistake to the detriment of the other partners.

In fact, had the board of directors actually declared plaintiffs' shares matured in March 1934, on the basis of that report and had paid to plaintiffs the par value of their shares, upon proof that the report was in error, the overpayment to plaintiffs could have been recovered by the association: Kurtz v. Bubeck, 39 Pa. Superior Ct. 370, cited with approval by the Supreme Court in Sperling v. Euclid B. & L. Assn., 308 Pa. 143. It follows that when such a mistake was discovered before payment, the board had both the right and the duty to refuse to declare a maturity.

We held, therefore, that the twenty-first series did not mature until April 20, 1936, and that the rights of plaintiffs date from that time.